AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>1110 N. Dysart Rd. Unit #2114, Avondale, AZ 85323<br>("SUBJECT PREMISES 5"). | Case No. 22-8166 mB<br><br>(Filed Under Seal) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A-5.**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 1715 | Firearms as Nonmailable |
| 18 U.S.C. § 922(a)(1) | Dealing in Firearms Without a License |
| 18 U.S.C. § 922(a)(5) | Transfer Firearm to Out of State Resident |

The application is based on these facts:

**See attached Affidavit of FBI Special Agent Daniel Kim.**

☒ Continued on the attached sheet.

☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Keith Vercauteren

KEITH VERCAUTEREN : Digitally signed by KEITH VERCAUTEREN
Date: 2022.05.06 12:20:33 -07'00'

*Applicant's Signature*

Daniel Kim, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___5/6/22  4:30pm___

*Judge's signature*

City and state: <u>Phoenix, Arizona</u>

Honorable JOHN Z. BOYLE, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-5
## PROPERTY TO BE SEARCHED

The property to be searched is the premises at **1110 N. Dysart Rd. Unit #2114, Avondale, AZ 85323 ("SUBJECT PREMISES 5")** in the city of Avondale within Maricopa County, Arizona, which is an apartment in a multi-apartment complex called Madison Heights, located near the intersection of North 7th Place and East Madison Street, and north of Agua Fria High School. The premises is located within building 2, and the number "2" is displayed in white with a dark background on a brick exterior wall. The exterior of the premises is painted orange and tan. The numbers "2114" are displayed in black with a white background on the tan exterior wall next to the front door, which is red in color. The front yard contains various trees and bushes, as well as a concrete pathway that leads to the front door. The following is a picture of the location to be searched:



The place to be searched includes: the residence; all rooms, attics, basements, and storage areas within **SUBJECT PREMISES 5**; all surrounding grounds, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises and that law enforcement agents performing the search are able to determine are associated with (and/or are used by the residents of) **SUBJECT PREMISES 5**; and secured locations associated with **SUBJECT PREMISES 5** (such as safes, mailboxes, lock boxes, or other locked or secured locations).

## ATTACHMENT B
## ITEMS TO BE SEIZED

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A-1 through A-14 ("**SUBJECT PREMISES, VEHICLES, or PERSONS**"), including any digital devices, for evidence, fruits or instrumentalities of violations 18 U.S.C. § 1715 (Firearms as Nonmailable); 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License); and 18 U.S.C. § 922(a)(5) (Transfer Firearm to Out of State Resident). These records and materials are more specifically described below.

1.     All firearms, magazines, firearm accessories, and/or ammunition;

2.     Any items relating to the possession, trafficking, sales, distribution, maintenance and use of firearms, to include but not limited to ammunition magazines, speed loaders, spare firearms parts, holsters, cleaning kits, or packaging material;

3.     Any documentation that relates to the ownership, possession, sale, transfer, trafficking, sales, or distribution of firearms, magazines, and firearm accessories, including but not limited to photographs, receipts, firearm containers, carrying cases, labels, packaging material, and firearm boxes;

4.     Documents, items and other indicia evidencing membership, affiliation, association or interaction with firearms trafficking or sales, including notes, letters, mailings, correspondence, or pictures;

5.     Computers, storage media, or any digital and electronic devices, including cellular telephones, used as a means to commit the violations described above.

6.     Any U.S. currency evidencing the proceeds derived from illicit firearms trafficking.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Daniel Kim, Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Concord Resident Agency, being duly sworn, state:

## INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following **SUBJECT PREMISES, VEHICLES**, and **PERSONS**, which are further described in Attachment A-1 through A-14, for the things described in Attachment B, and seized electronic devices will be searched according to the protocol set forth in Attachment C:

- 1748 Alcatraz Ave. Berkeley, CA 94703 (hereinafter, "**SUBJECT PREMISES 1**");

- 1295 Homestead Ave. Apt. #38, Walnut Creek, CA 94598 (hereinafter, "**SUBJECT PREMISES 2**");

- 809 Poplar Way, Oakland, CA 94607 (hereinafter, "**SUBJECT PREMISES 3**");

- 5750 W. Raymond St., Phoenix, AZ 85043 (hereinafter, "**SUBJECT PREMISES 4**");

- 1110 N. Dysart Rd. Unit #2114, Avondale, AZ 85323 (hereinafter, "**SUBJECT PREMISES 5**").

2.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Kamar FERGUSON ("FERGUSON"), Kenneth HENDON ("HENDON"), Ronald GUILLORY ("GUILLORY"), Niqeel WINDHAM ("WINDHAM"), and Eugene BELL ("BELL") (collectively, the "**SUBJECT PERSONS**") have violated, are violating, and will continue to violate 18 U.S.C. § 1715 (firearms as nonmailable); 18 U.S.C. § 922(a)(1) (dealing in firearms without a license); 18 U.S.C. § 922(a)(5) (transfer firearm to out of state resident) (collectively, the "Target Offenses"). There is probable cause to search the **SUBJECT PREMISES, VEHICLES,**

1

and **PERSONS** listed in Attachments A-1 through A-14 for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

3.    The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses.  This affidavit does not set forth all my knowledge about this matter; it is intended to only show that there is sufficient probable cause for the requested warrant.

## AFFIANT BACKGROUND

4.    I am a Special Agent ("SA") with the Federal Bureau of Investigation and have been so employed since January 2020. During that time, my duties and responsibilities have included conducting criminal investigations for possible violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code. I have had extensive training in law enforcement investigation techniques, including but not limited to 800 hours of training at the FBI Academy at Quantico, Virginia. Prior to joining the FBI, I was a Special Agent with the United States Secret Service ("USSS") in San Francisco, California, where I was assigned to the Financial Crimes Task Force as well as the U.S. Marshals Fugitive Task Force. While assigned to these task forces, I participated in the investigations of various crimes including financial and violent crimes. Prior to joining the USSS, I was a Deputy Sheriff in San Diego County, San Diego, California, where I conducted investigations of numerous crimes, including violent crimes, gangs, firearm, and narcotics violations. In addition to the training and experience discussed above, I have also spoken to and worked with more experienced federal and state agents and officers throughout my career.

5.    Currently, I am assigned to the FBI Safe Streets Gang Task Force in Contra Costa County, San Francisco Field Office, where my responsibilities include the investigation of federal firearms, gangs, violent crimes, and narcotics violations. In this position, I have authored and participated in search warrants involving residences, social

2

media accounts, electronic devices, and other locations. As a result, I am familiar with the types of evidence these searches garner.

## APPLICABLE STATUTES

6. Title 18, United States Code, Section 1715 provides: "Pistols, revolvers, and other firearms capable of being concealed on the person as nonmailable and shall not be deposited in or carried by the mails or delivered by any officer or employee of the Postal Service."

7. Title 18, United States Code, Section 922(a)(1) provides: "It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."

8. Title 18, United States Code, Section 922(a)(5) provides: "It shall be unlawful for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides."

## FACTS SUPPORTING PROBABLE CAUSE

### A. Overview

9. The United States Postal Inspection Service ("USPIS") and FBI Safe Streets Task Force ("SSTF") are investigating a group of persons, including FERGUSON, HENDON, BARNETT, GUILLORY, BELL, and others, who appear to be trafficking firearms from out of state into the Bay Area. As described below, it appears that FERGUSON, BELL, and others obtain the guns in Texas and Arizona, and then deliver them to HENDON, BARNETT, GUILLORY, and others in the Bay Area. At first, it

3

appears that FERGUSON was mailing the (disassembled) guns. Therefore, postal inspectors were periodically monitoring packages sent from Katy, TX, and Phoenix, AZ, to the Bay Area. Then after USPIS seized one of his packages, he began driving the guns to the Bay Area himself or with the help of others.

### B. Identification of Kamar FERGUSON and Kenneth HENDON

10. On July 13, 2021, FBI SSTF members arrested Daniel BARNETT ("BARNETT") for an outstanding federal arrest warrant for 18 U.S.C. § 3583 (violation of conditions of supervised release) at the Economy Inn, 12572 San Pablo Ave., Room #121, Richmond, CA 94805. FBI SSTF members conducted a search of Room #121 and found numerous firearms and ammunition.

11. On August 30, 2021, a federal search warrant for Instagram account *danniebo569* was issued, which was identified as BARNETT's Instagram account. After reviewing the search warrant results, FBI SSTF members identified multiple images and private conversations related to the illegal possession, sales, distribution, and/or trafficking of firearms, firearm accessories, and/or ammunition between *danniebo569* and other Instagram accounts, including *kamar_ferguson* and *whoislilken*.

12. On November 12, 2021, a federal warrant was issued for the following Instagram account: www.instagram.com/whoislilken. Instagram provided the following email address associated with the account: hendonkenneth@yahoo.com, which combines the last and first name of Kenneth HENDON. FBI SSTF members accessed a DMV photograph of HENDON in law enforcement databases. Agents compared the Instagram photographs posted on the account belonging to *whoislilken* to the aforementioned DMV photograph and observed that the person in the posted Instagram photographs appeared to be HENDON. Based on the email address and photographs on the Instagram return, I believe this Instagram account belongs to HENDON. Instagram also provided 510-334-

4

6001 as the phone number associated with the account.[1]

13.      On November 12, 2021, a federal warrant was issued for the following Instagram account: www.instagram.com/kamar_ferguson. The Instagram search warrant return listed the name associated with the account was Kamar FERGUSON, and the phone number was listed as "+*16282192847 Verified.*" The term "verified" indicates the account holder responded to a text sent to the listed phone number. A T-Mobile subpoena for the phone number 628-219-2847 listed FERGUSON as the subscriber. FBI SSTF members accessed a DMV photograph of FERGUSON in law enforcement databases. Agents compared the Instagram photographs posted on the account belonging to *kamar_ferguson* to the aforementioned DMV photograph and observed that the person in the posted Instagram photographs appeared to be FERGUSON. Based on the photographs, phone number, the name of the Instagram handle, and subscriber information, I believe the Instagram account belongs to FERGUSON.

14.      A law enforcement database check linked FERGUSON with the address 24757 Grand Harbor Dr., Apt. 223, Katy, Texas. A law enforcement database check of HENDON listed his residence as 1748 Alcatraz Avenue, Berkeley, CA, which is **SUBJECT PREMISES 1**. Additionally, on October 29, 2021, FBI SSTF members conducted surveillance at **SUBJECT PREMISES 1** and identified HENDON in the vicinity of the premises based on a comparison to HENDON's booking photograph taken following an unrelated incident.

15.      On March 17, 2022, California Highway Patrol ("CHP") officers arrested FERGUSON on California state firearms charges in Livermore, CA stemming from a vehicle traffic stop. Eugene Hayes BELL ("BELL") and Kanisha WARE ("WARE") were

---

[1] A subsequent subpoena revealed that the listed subscriber of the phone number linked to that Instagram was Kaija Bennett. In an Instagram conversation, HENDON indicated that he was paying Bennett to use the aforementioned phone number.

5

in the front seats of the vehicle, and FERGUSON was in the rear passenger seat. The CHP officer found a gray bag on the rear driver side floorboard where FERGUSON was sitting. Inside the bag, there were two (2) Glock handguns, one (1) Micro Draco pistol, as well as numerous magazines and ammunition. Furthermore, the CHP officer found and seized two cellular phones, which were located on FERGUSON's person.

16.    On March 28, 2022, a federal search warrant was issued for the two cellular phones recovered from FERGUSON's person. On March 30, 2022, an arrest warrant for Kamar FERGUSON was issued, charging him via criminal complaint with one count of 18 U.S.C. § 1715 (firearms as nonmailable).

17.    An analysis of the phone and Instagram returns revealed that HENDON and FERGUSON communicated regarding the trafficking of firearms and USPS packages, which were sent throughout the East Bay Area.[2] The communications contained multiple pictures and discussions of firearms and packages, postal receipts, discussions with prospective buyers regarding sale prices, coordination of package retrieval, and payments between HENDON and FERGUSON. For example, on May 13, 2021, HENDON sent FERGUSON a picture of what appears to be a Micro Draco firearm with an extended magazine loaded into the well. After receiving the picture, FERGUSON asked HENDON where he was located, and HENDON stated Alcatraz, which is the street where **SUBJECT PREMISES 1** is located. FERGUSON then wrote that he would come and get it. FERGUSON and HENDON then engaged in a conversation regarding selling the firearm:

FERGUSON: I know I got somebody who want it[.]

HENDON: How much[?]

---

[2] In addition to SUBJECT PREMISES 1, 2, and 3, these addresses include: 10501 Voltaire Ave, Oakland, CA, 5517 McFarlan Ranch Dr. Antioch, CA, 2719 Foothill Blvd., #101, Oakland, CA, 1390 Creekside Dr. #57, Walnut Creek, CA, 2499 Brian Rd., San Pablo, CA, 1685 Maubert Ct. #B, San Leandro, CA, 453 S. 17th St. Richmond, CA, 921 Spruce Ct. Rodeo, CA, 5593 Plumbridge Way, Antioch, CA, 2976 Santos Lane #303, Walnut Creek, CA, 1221 E. Bellevue Road, Atwater, CA.

FERGUSON: I'm finna try and tell em 25[.] He want to see it in person[.]

HENDON Ight[.] Ppl been telling me that's tax[.] Say 24[.]

FERGUSON: I got different clientel[.]

HENDON: Ik[.]

Based on my training and experience "25" and "24" refer to $2,500 and $2,400 as sale prices for the firearm. I believe that when HENDON refers to "tax," he is stating that he believes $2,500 is too expensive a price to charge for the firearm. I believe that when FERGUSON refers to his clientele, he is referring to people to whom he illegally sells firearms. FERGUSON also appears to sell specific types of firearms. On April 10, 2021, FERGUSON received a text message from an unknown individual asking if FERGUSON had any customers looking for AR-15 firearms. FERGUSON replied that he did not and indicated that his customer's were only interested in "glock[s][,] dracos[, and] Ruger 57 fn."

**B. SUBJECT PREMISES 1**

18.    I believe FERGUSON traffics firearms to **SUBJECT PREMISES 1** for the following reasons. A USPIS Inspector conducted an address check of **SUBJECT PREMISES 1,** which revealed that from April 2021 to October 2021, approximately eleven (11) USPS packages were mailed to **SUBJECT PREMISES 1** from USPS post offices in Katy, TX. Approximately five of the USPS packages were addressed to Kenneth HENDON and approximately eight of the USPS packages had a return address of FERGUSON's Katy, TX, address.[3] Between April 2021 and February 2022, there were over 1,000 phone calls and/or text messages between FERGUSON's and HENDON's

---

[3] I note that the sender and recipient names for the rest of the USPS packages included: Samantha Hendon, Shakila Hendon, Kaija Bennet, Tobi Wilson, Cory Leon, Terry Windham, Christian Sheppard. Based on my training and experience, I believe aliases are sometimes used on packages containing contraband, and I believe firearms traffickers will often use aliases, incomplete names and addresses, and/or old addresses to help conceal their identities from law enforcement.

7

phone numbers. The volume of phone calls and/or text messages further demonstrates the relationship between FERGUSON and HENDON during the timeframe the packages were delivered.

19.     Below are two examples of conversations about firearms from around the same time packages were sent to **SUBJECT PREMISES 1**. There were over 20 text message conversations between FERGUSON and HENDON regarding the selling of firearms between January 2021 and November 2021 generally.

20.     For example, on October 4, 2021, two packages were sent from Katy, TX, to **SUBJECT PREMISES 1**, which was projected to arrived on October 7, 2021.[4] Both packages had a return address of FERGUSON's Katy, TX, address, and were addressed to "Kenneth Hendon" at **SUBJECT PREMISES 1**.[5] An analysis of FERGUSON's cellular phone showed that FERGUSON and HENDON discussed firearms around the same time the packages were sent to **SUBJECT PREMISES 1**. On October 6, 2021, FERGUSON sent HENDON a text message saying, "U bet not miss them packages bitch cause they out there on the crip[.]" HENDON responded, "I got it came early. How much for the 27 N the 30[.]" FERGUSON said, "I need as much as I can get. At least 13. I really want 14[.]" I believe, based on my training and experience, that "27 N the 30" refers to a Glock model 27 firearm and a Glock model 30 firearm. I believe that when FERGUSON referred to "packages" in the above-mentioned text exchange with HENDON, he is referring to the packages sent to **SUBJECT PREMISES 1** on October 4, 2021, which is where HENDON resides.

21.     Additionally, in that same text message conversation on October 6, 2021,

---

[4] I am informed by a USPIS Inspector that packages sometimes arrive earlier or later than the projected arrival date.

[5] I note that the sender of both packages is listed as Shakila Hendon. Based on my training and experience, I believe aliases are sometimes used on packages containing contraband, and I believe firearms traffickers will often use aliases, incomplete names and addresses, and/or old addresses to help conceal their identities from law enforcement.

HENDON wrote to FERGUSON, "When I sent u money for straps u gone get more?" FERGUSON replied, "Yea[.] They got shit now[.] 26 and another 19x[.]" I believe that HENDON is asking FERGUSON if he can purchase firearms from him.

22.    Just a few days later, on October 12, 2021, another package was sent from Katy, TX, to **SUBJECT PREMISES 1,** and the recipient was listed as Kenneth Hendon.[6] The return address was the address in Katy, TX, associated with FERGUSON. An analysis of FERGUSON's phone revealed the following conversation that took place on October 7, 2021, just five days prior to the sending of the package:

HENDON: What's coming[?] Nobody b wanting them

FERGUSON: Gen 4 21 and a g22 gen 3 I think

HENDON: All 9s

FERGUSON: Hell naw a 40 and a 45

HENDON: Ok ok[.] Got a sell already[.] Which one hold 45[?]

FERGUSON: The 21

HENDON: Ight[.] U check it[.]

FERGUSON: Yea[,] it still ain't there yet[.]

HENDON: Just lmk when u ready to grab my shit[.]

The conversation continued on October 9, 2021. FERGUSON stated to HENDON, "Send yo money so I can grab yo shit to[o .]" HENDON then replied, "Ight[.] I got 5 on cash app im send u the two[.]"

23.    I believe that when HENDON stated "[n]obody b wanting them," and "[g]ot a sell already," he was referring to customers initially not wanting to buy the firearms that FERGUSON was shipping to him, and then HENDON indicated that he ultimately found

---

[6] The sender's name listed on the package was Shakila Hendon and an analysis of FERGUSON's Instagram and phone returns revealed that Shakila Perry is FERGUSON's girlfriend. I note that during this time period, FERGUSON also sent a package to 453 S. 17th Street, Richmond, CA 94804.

9

a buyer. I believe FERGUSON is referring to a Glock 21 Generation 4 pistol and a Glock 22 Generation 3 pistol. I know from my training and experience that the Glock 21 pistol is chambered in .45 caliber, and the Glock 22 pistol is chambered in .40 caliber. Therefore, I believe that FERGUSON was referring to the pistols' calibers when he told HENDON that the "Gen4 21" and the "g22 gen 3" were a "40 and a 45". I also believe that when HENDON inquired "what's coming," he was asking FERGUSON about which firearms were in the package that FERGUSON was mailing. An analysis of FERGUSON's and HENDON's Cashapp transactions showed that HENDON sent FERGUSON $500 via Cashapp on October 9, 2021, which, based on my training and experience, is consistent with the price of a Glock firearm. Based on the timing and content of the conversation between FERGUSON and HENDON in relation to the package mailed to **SUBJECT PREMISES 1**, as well as the Cashapp transaction, I believe that FERGUSON trafficked firearms to **SUBJECT PREMISES 1**, which HENDON then sold.

24. On November 9, 2021, a package sent from Katy, TX, to the aforementioned Voltaire address in Oakland, CA, and addressed to Kenneth Hendon, was intercepted by USPIS inspectors. A federal search warrant was issued for that package, and a search of the package revealed that it contained three (3) complete firearm slides with serial numbers VMA626, BTDH891, RKZ26, one (1) lower firearm receiver with serial number VMA626, and three (3) high-capacity magazines. Following the interception of the package in November 2021, FERGUSON appeared to stop sending packages from Katy, TX, and instead, changed his method of firearms trafficking. Additionally, an analysis of FERGUSON's phone revealed that he uses apps such as Text Free, which help to conceal communications between parties. Also, location information from FERGUSON's cellular telephones, mail analysis, and FBI surveillance revealed that FERGUSON moved from Katy, TX, to 5750 W. Raymond St. Phoenix, AZ, shortly after the package was intercepted.

25. On February 2, 2022, a federal search warrant was issued for location information for two telephone numbers associated with FERGUSON. On February 19,

10

2022, at approximately 8:10 p.m., FBI SSTF received cell site location information for the cellular telephones showing that they had moved from Phoenix, AZ, to the vicinity of Camden Grand Harbor Apartments, 24757 Grand Harbor Dr. Katy, TX. On February 19, 2022, at approximately 2:25 p.m., and again at approximately 5:55 p.m., cell site location information showed that the cellular telephones were located within the vicinity of Academy Sports and Outdoors in Katy, TX, which is a sporting goods store that sells firearms, ammunition, and firearm accessories, among other sporting and outdoor products.[7] Further analysis of FERGUSON's cellular telephone revealed that on February 19, 2021, FERGUSON sent a text message through the Text Free app, stating, "Hey I was wondering if the glock 29 was still available." FERGUSON then stated, "[I]'m, in houston I leave this afternoon can we meet this evening or sometime around noon tomorrow. I want to buy it[.]" I note that Katy, TX, is a suburb of Houston, TX.

26.    On February 20, 2022, at approximately 5:39 p.m., cell site location information for the cellular telephones showed that they were located within the vicinity of 5750 W. Raymond St. Phoenix, AZ. On February 22, 2022, at approximately 8:39 p.m., cell site location showed that the cellular telephones were located in Oakland, CA. Toll analysis of HENDON's and FERGUSON's phone numbers revealed that they called each other approximately 12 times between February 16, 2022, and February 27, 2022, including February 22, 2022, which shows that HENDON and FERGUSON were in frequent communication during the time period that FERGUSON traveled to Oakland following his conversation about purchasing a Glock. Additionally, an analysis of FERGUSON's phone showed that **SUBJECT PREMISES 3** was typed into WAZE on February 22, 2022, which is an app that provides driving directions. **SUBJECT PREMISES 3** is in Oakland, which is consistent with the cell site location information,

---

[7] A subpoena to Academy Sports and Outdoors indicated that there are no records of FERGUSON purchasing a firearm; however, the store does not record ammunition or magazine purchases.

11

and is an address linked to FERGUSON's trafficking of firearms as outlined below. On the evening of February 23, 2022, cell site location information for the cellular telephones showed that FERGUSON had returned to Arizona.

27.     Based on the above facts, I believe that FERGUSON drove from Phoenix, back to Katy, TX, to buy guns and possibly magazines, and then drove to Oakland to deliver them, and then returned to Phoenix. I note that it is an approximate 17-hour drive from Phoenix, AZ, to Katy, TX, one way. And it is an approximate 12-hour trip from Phoenix, AZ, to Oakland, CA, one way. Thus, it appears that FERGUSON drove at least 50 hours and 4,000 miles in four days to obtain guns and traffic them into the Bay Area.

28.     On March 4, 2022, HENDON was sentenced in California state court on an unrelated criminal matter to 90 days' jail, and was incarcerated from March 4, 2022, to April 15, 2022, and therefore did not have access to his residence during that time.

29.     On May 2, 2022, members of the FBI SSTF observed HENDON open the front gate to **SUBJECT PREMISES 1** and enter. In sum, based on the phone contact between FERGUSON and HENDON, the Cashapp transaction, the recovery of a firearm from a package with HENDON listed as the recipient, and the timing and content of FERGUSON's multiple text message conversations to HENDON in relation to the timing of the packages sent by FERGUSON to **SUBJECT PREMISES 1**, I believe that FERGUSON sends firearms to **SUBJECT PREMISES 1**, where I believe HENDON resides.

### C. SUBJECT PREMISES 2

30.     I believe FERGUSON traffics firearms to **SUBJECT PREMISES 2** for the following reasons. A USPIS Inspector conducted an address check of **SUBJECT PREMISES 2,** which revealed that from October 2020 to November 2021, approximately nine (9) USPS packages were mailed to **SUBJECT PREMISES 2** from USPS post offices

in Katy, TX.[8] A law enforcement database check of **SUBJECT PREMISES 2** listed Ronald GUILLORY and Justine NICHOLS ("NICHOLS") as residents and revealed that GUILLORY is listed as a subscriber to phone number 510-277-6229.

31.     An analysis of FERGUSON's cellular phone revealed that FERGUSON and GUILLORY communicated regarding firearms. On April 15, 2021, FERGUSON sent GUILLORY a photograph of a Glock-style firearm. On May 20, 2021, FERGUSON sent GUILLORY a photograph of a Micro Draco-style firearm and a Glock-style firearm, which appears to have a loaded drum magazine inserted into the well. On August 31, 2021, FERGUSON sent GUILLORY another photograph of a Glock-style firearm.

32.     On November 9, 2021, a USPIS Inspector received an alert of an incoming package (hereinafter "the Oakland Parcel") coming from Katy, TX to Oakland, CA. The cost of the postage was $31.10. In addition, the recipient of the Oakland Parcel was listed as Kenneth Hendon. Also on November 9, 2021, the assigned USPIS Postal Inspector received a separate alert of another incoming package (hereinafter "the Walnut Creek Parcel") coming from Katy, TX, to **SUBJECT PRESMISES 2**, and the cost of the postage was $21.95. [9] Both parcels were processed on the same day approximately thirty minutes apart, at two different post offices in Katy, TX.

33.     A USPIS Inspector checked USPS databases and identified the Chase VISA debit card number used to purchase the postage for both the Oakland Parcel and the Walnut Creek Parcel. Subsequently, Chase Bank provided the following information associated

---

[8] I note that USPIS Inspectors were only able to retrieve sender and recipient names for two of the packages, which included: Chris Sheppard, Kiara Swarn, and Risa Swarn. Based on my training and experience, I believe aliases are sometimes used on packages containing contraband, and I believe firearms traffickers will often use aliases, incomplete names and addresses, and/or old addresses to help conceal their identities from law enforcement.

[9] I note that the sender of both the Oakland and Walnut Creek packages was not listed as Kamar FERGUSON. Additionally, the Walnut Creek package did not contain a return address associated with FERGUSON, and the recipient of the Walnut Creek package was not listed as Ronald GUILLORY. However, based on my training and experience, I know that firearms traffickers often do not list their own name and address when sending a package.

with the Chase VISA debit card: *Name: Kamar J. Ferguson; Address: 5517 McFarlan Ranch Dr. Antioch, CA 94531; Phone Number: 628-219-2847*. Additionally, the amounts paid for the USPS postage was reported in the Chase Bank statement for the Chase VISA card.

34.     A USPIS Inspector retrieved and viewed video surveillance footage of the USPS Post Office in Katy, TX, from November 9, 2021, from where the Walnut Creek Parcel was shipped. FBI agents compared the booking photograph of FERGUSON taken on May 3, 2021, following an unrelated matter, with the video surveillance footage. Agents observed that FERGUSON's booking photograph appeared similar to the image of the person captured on the surveillance video. I note that the surveillance video from the post office from where the Oakland Parcel was sent was not working on November 9, 2021.

35.     On March 24, 2022, FBI SSTF members conducted surveillance at **SUBJECT PREMISES 2** and observed a person who appeared to be GUILLORY, based on a comparison to his California DMV photograph, walk from the front door area of **SUBJECT PREMISES 2** to a white 2017 Honda Accord, bearing California license plate 7YGV810, with VIN number 1HGCR2F59HA204935 (hereinafter, "Accord") and open the driver side door. FBI SSTF members also observed a purple 2015 Dodge Charger, bearing California license plate 8UMW240, with VIN number 2C3CDXEJ4FH915311 (hereinafter, "Charger"). Both vehicles were observed in the parking lot of the apartment complex of **SUBJECT PREMISES 2**. I note that the parking lot for **SUBJECT PREMISES 2** appears to be specifically for residents of the apartment complex of **SUBJECT PREMISES 2**. FBI SSTF members checked California DMV databases, which listed the Charger and Accord as NICHOLS' registered vehicles, with **SUBJECT PREMISES 2** as the listed addresses. Based on numerous social media photographs of GUILLORY and NICHOLS hugging each other, and the fact that NICHOLS visited GUILLORY while he was previously in custody on an unrelated matter, I believe NICHOLS is GUILLORY's girlfriend. Therefore, I believe GUILLORY uses the vehicles

14

registered to NICHOLS. I know, based on my training and experience, that people who illegally purchase firearms often keep the contraband in their vehicles.

36.     As previously discussed, on December 9, 2021, a federal search warrant was issued for the Oakland Parcel. On December 10, 2021, USPIS searched the Oakland Parcel, which contained three (3) complete firearm slides with serial numbers VMA626, BTDH891, RKZ26, one (1) lower firearm receiver with serial number VMA626, and three (3) high-capacity magazines. Federal law enforcement was unable, however, to prevent the delivery of the Walnut Creek Package to **SUBJECT PREMISES 2**.

37.     An analysis of FERGUSON's phone records showed that between January 2021 and February 2022, there were over 800 phone calls and/or text messages between FERGUSON and GUILLORY. The volume of phone calls further demonstrates the relationship between FERGUSON and GUILLORY.

38.     Toll analysis of GUILLORY's and FERGUSON's phone numbers revealed that they called each other approximately 12 times between February 14, 2022, and February 23, 2022, including four times on February 23, 2022, which shows that GUILLORY and FERGUSON were in frequent communication during the time period that FERGUSON traveled to Oakland following the conversation outlined in paragraph 25 between FERGUSON and an unknown individual regarding the purchase of a Glock firearm.

39.     An analysis of FERGUSON's Cashapp account revealed that five days before the Walnut Creek parcel was shipped on November 4, 2021, FERGUSON received a payment of $3,300 from a person listed as "Ronald[.]" Based on my training and experience, I believe $3,300 is an amount consistent with firearm sale prices. Ronald GUILLORY is listed in law enforcement databases as residing at **SUBJECT PREMISES 2**, which is the location where the Walnut Creek parcel was sent.  Therefore, based on the timing of the package, as well as the amount of money paid to FERGUSON, and the fact that "Ronald" is GUILLORY's first name, I believe that the Cashapp payment was sent

15

from GUILLORY to FERGUSON in exchange for the purchase of firearms contained in the Walnut Creek parcel.

40. I believe that FERGUSON sends firearms to **SUBJECT PREMISES 2** for the following reasons: the Walnut Creek and Oakland packages were sent from Katy, TX, on the same day and paid for with the Chase VISA card associated with FERGUSON, one of which was intercepted and found to contain firearms; an analysis of FERGUSON's phone revealed communications in which FERGUSON sent GUILLORY pictures of firearms; the observation of GUILLORY in the immediate vicinity of **SUBJECT PREMISES 2**; the volume of communications between FERGUSON and GUILLORY; and that GUILLORY and FERGUSON were in communication during the time period where FERGUSON traveled to Oakland after discussing purchasing a firearm at the end of February 2022.

## D. SUBJECT PREMISES 3

41. I believe FERGUSON traffics firearms to **SUBJECT PREMISES 3** for the following reasons. A law enforcement database check of **SUBJECT PREMISES 3** listed Niqeel WINDHAM as a resident, and a subpoena revealed that WINDHAM is listed as a subscriber to phone number 510-690-5787. A USPIS Inspector conducted a mail inspection for **SUBJECT PREMISES 3**, which revealed that **SUBJECT PREMISES 3** received mail that was addressed to WINDHAM in March 2022. On April 27, 2022, an FBI SSTF member observed a white 2013 Dodge Dart, bearing California license plate AU42W92, with VIN number 1C3CDFBHXDD134296, parked on the street in front of **SUBJECT PREMISES 3**. A law enforcement database check revealed that "Niqeel Windham" is the registered owner of the aforementioned vehicle, with **SUBJECT PREMISES 3** as the listed address. I know, based on my training and experience, that people who illegally purchase firearms often keep the contraband in their vehicles. Between April 2021 and February 2022, there were over 300 phone calls and/or text messages between FERGUSON's and WINDHAM's phone numbers. The volume of phone calls and/or text

16

messages further demonstrates the relationship between FERGUSON and WINDHAM.

42.    Additionally, an analysis of FERGUSON's cell phone revealed conversations in which FERGUSON discussed firearms trafficking in relation to **SUBJECT PREMISES 3**. For example, on March 23, 2021, an individual sent FERGUSON a text saying, "I'm ready now ask him if he ready I'll jump on the freeway[.]" FERGUSON replied, "Yea my cousin there. Ima have to figure out a way to get u the k clip smh[.]" Then, FERGUSON wrote, "809 poplar[.]" I note that 809 Poplar Way, Oakland, CA, is the address of **SUBJECT PREMISES 3**. The individual replied to FERGUSON, "Qing my way[.]" The following day, on March 24, 2021, the aforementioned individual sent FERGUSON a text saying, "Bro get those clips for me brother. I just sold the 19 with no clip for 1350. I got 1350 on me now[.]" Based on my training and experience, I believe that FERGUSON directed the individual to retrieve firearms and magazines from **SUBJECT PREMISES 3**. I further believe that "clips" refers to magazines for firearms, and "sold the 19 with no clip for 1350" means the individual sold a Glock model 19 firearm with no magazine for $1,350. Given that FERGUSON directed the above individual to go to **SUBJECT PREMISES 3** to retrieve a firearm, I believe that FERGUSON traffics firearms to **SUBJECT PREMISES 3**.

43.    Additionally, toll analysis of WINDHAM's and FERGUSON's phone numbers revealed that they contacted each other approximately 13 times between February 15, 2022, and February 25, 2022, which shows that WINDHAM and FERGUSON were in communication around the time that FERGUSON traveled to Oakland following the conversation outlined in paragraph 25 between FERGUSON and an unknown individual regarding the purchase of a Glock firearm. Specifically, toll records show that WINDHAM and FERGUSON were in communication two days before FERGUSON's conversation about selling a Glock firearm, and approximately two days after FERGUSON returned to Arizona. As noted above, an analysis of FERGUSON's phone showed that **SUBJECT PREMISES 3** was typed into WAZE on February 22, 2022, which was consistent with

17

FERGUSON's cell site location information. Therefore, I believe that FERGUSON traveled to **SUBJECT PREMISES 3** to sell a firearm.

44.    In sum, based on the phone contact between FERGUSON and WINDHAM, the observation of WINDHAM's vehicle in the immediate vicinity of **SUBJECT PREMISES 3**, and the content of FERGUSON's text message conversations in relation to firearms and **SUBJECT PREMISES 3**, I believe that FERGUSON and WINDHAM store firearms in **SUBJECT PREMISES 3**, where I believe WINDHAM resides.

### E. SUBJECT PREMISES 4 and 5

45.    On February 2, 2022, and April 18, 2022, federal search warrants were issued for location information for FERGUSON's telephone numbers. Analysis of the cell site location information showed that the telephone numbers were in the vicinity of **SUBJECT PREMISES 4** on numerous occasions between February and April 2022. A USPIS Inspector conducted a mail inspection for **SUBJECT PREMISES 4**, which revealed that **SUBJECT PREMISES 4** received mail that was addressed to FERGUSON (**SUBJECT PERSON** in Attachment A-10) in January 2022 and March 2022.

46.    On March 17, 2022, FERGUSON made a second trip to the Northern District of California from Arizona, just three weeks after his trip in February. On March 16, 2022, FBI surveillance units from the FBI Phoenix Field Office conducted surveillance at **SUBJECT PREMISES 4** and observed FERGUSON walking away from the front door area of **SUBJECT PREMISES 4**. FBI surveillance units followed FERGUSON from **SUBJECT PREMISES 4** to **SUBJECT PREMISES 5**, a multi-unit apartment complex, and observed FERGUSON walk towards the front door area of **SUBJECT PREMISES 5**. A law enforcement database check of **SUBJECT PREMISES 5** listed Eugene Hayes BELL and Kanisha WARE as residents. FBI surveillance units further observed a black 2017 Honda Accord, bearing California license plate 7ZIJ539, with VIN number 1HGCR2F11HA204652 (hereinafter, "the Honda") (**SUBJECT VEHICLE** in Attachment A-8) in the **SUBJECT PREMISES 5** parking lot. The parking lot for

18

**SUBJECT PREMISES 5** appears to be specifically for residents of the apartment complex of **SUBJECT PREMISES 5**. A law enforcement database check revealed that "Nakesha Ferguson" is the registered owner of the Honda[10]. Law enforcement databases listed Nakesha HUGULEY as FERGUSON's mother.

47. At approximately 12:55 p.m., FBI surveillance units observed FERGUSON enter the Honda, along with BELL (**SUBJECT PERSON** in Attachment A-14), who entered as the driver. FBI surveillance units followed the Honda to **SUBJECT PREMISES 4**, where FERGUSON exited the Honda and walked towards the front door area of **SUBJECT PREMISES 4**. Shortly thereafter, FBI surveillance units observed FERGUSON re-enter the Honda. FBI surveillance units followed the Honda back to **SUBJECT PREMISES 5** and observed FERGUSON and BELL walk towards the front door area of **SUBJECT PREMISES 5**.

48. Cell site location information for FERGUSON's cellular phones showed that the phones were located within the immediate vicinity of **SUBJECT PREMISES 5** throughout the night, from March 16, 2022, to March 17, 2022. Furthermore, cell site location information for the phones showed that they departed from the vicinity of **SUBJECT PREMISES 5** during the morning of March 17, 2022, and arrived in Livermore, CA, during the afternoon of March 17, 2022, where police conducted a traffic stop. FERGUSON was in the rear passenger seat of the Honda. BELL and WARE were in the front seats. In a bag on the floor at FERGUSON's feet, officers recovered two Glock pistols, a Micro Draco pistol, magazines, and ammunition. FERGUSON, BELL, and WARE were arrested on California state firearm trafficking charges. Based on my training and experience, I know firearm traffickers will often store firearms and/or illegal contraband at their own residences, as well as other subjects' residences in an attempt to

---

[10] I note that **SUBJECT PREMISES 5** is not the listed address for the Honda on the vehicle registration.

19

evade law enforcement.

49.     Due to the fact that FERGUSON and BELL were observed accessing and driving the Honda at **SUBJECT PREMISES 4** and **SUBJECT PREMISES 5**, and the fact that numerous firearms were seized from the Honda in Livermore, CA with FERGUSON and BELL as passengers, I believe FERGUSON and BELL use the Honda. Additionally, an ATF database search revealed "Kanisha Nashay Ware" was the purchaser for the two Glock firearms and the Micro Draco pistol found in the Honda. The Micro Draco pistol was purchased by WARE on March 4, 2022, and the two Glock firearms were purchased by WARE on March 15, 2022. All of the firearms were purchased in the Phoenix, AZ, area. Based on my training and experience, I believe firearms traffickers often have other individuals purchase firearms for them to evade law enforcement detection.

50.     An analysis of FERGUSON's cellular phone showed that on March 4, 2022, the same day WARE purchased the Micro Draco pistol found in the Honda, FERGUSON sent a text message to an unknown individual on a burner phone stating, "Please text me[.]" A reply was sent to FERGUSON which stated, "??...Draco...Call me wen yu can[.]" FERGUSON then texted back and stated, "Micro[.]" In response, the individual (likely WARE) wrote, "Alright we bout to go bk to the store[.]" Based on my training and experience, "Draco" and "Micro" are references to a Micro Draco pistol. The conversations occurred a few weeks prior to FERGUSON's California state arrest in Livermore, CA, during which a Micro Draco pistol was recovered in a bag which was located by his feet. These conversations also occurred on the same date that WARE purchased the Micro Draco pistol which was recovered in a bag at FERGUSON's feet with WARE as a passenger in the same Honda. Based on the analysis of FERGUSON's cell site location information, law enforcement knows that FERGUSON went to **SUBJECT PREMISES 4** and **5** the night before and the morning of FERGUSON's arrest with these firearms. Based on the contents of FERGUSON's cellular phone, and his arrest in Livermore, CA and subsequent

20

recovery of firearms, I believe FERGUSON, BELL, and WARE could have items in Attachment B at **SUBJECT PREMISES 4** and **5.**

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

51.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT PREMISES, VEHICLES,** and **PERSONS,** in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

52.    I submit that if a computer or storage medium is found on the **SUBJECT PREMISES, VEHICLES,** and **PERSONS,** there is probable cause to believe relevant records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experiences, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in

21

particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

53.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES, VEHICLES,** and **PERSONS** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

22

b.    Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also

23

indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

24

54.   <u>Necessity of seizing or copying entire computers or storage media.</u> In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   <u>The time required for an examination.</u> As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   <u>Technical requirements.</u> Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the **SUBJECT PREMISES, VEHICLES**, and **PERSONS**. However, taking the

storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

d.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## REQUEST FOR SEALING

55.    I further request, in order to avoid compromising this ongoing investigation, to avoid the subjects' flight, and for the safety of the agents and officers, that this application and affidavit, warrant, and order be filed under seal until further order of the Court, except that working copies should be made available to the United States Attorney's Office, the FBI, any other law enforcement agency designated by the United States Attorney's Office.

## CONCLUSION

56.    Based on the information above, there is probable cause to believe a search of the **SUBJECT PREMISES**, **VEHICLES**, and **PERSONS** listed in Attachments A-1 through A-14 will reveal the items listed in Attachment B, which are evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. § 1715 (firearms as nonmailable); 18 U.S.C. § 922(a)(1) (dealing in firearms without a license); 18 U.S.C. § 922(a)(5) (transfer firearm to out of state resident).  Therefore, I respectfully request that the Court

26

issue the proposed search warrants. Any electronic devices or media will be searched pursuant to the protocol and procedures described in Attachment C.

_____
DANIEL KIM
Special Agent, FBI

Subscribed and sworn to electronically before me this ___6th___ day of May, 2022.

_____
HONORABLE JOHN Z. BOYLE
United States Magistrate Judge

27